IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TARAHJAY M. ROSS,<br>    **Plaintiff** | :<br>: | |
| | : | No. 1:21-cv-01994 |
| v. | :<br>: | |
| | : | (Judge Kane) |
| CAPTAIN STEVE SMITH, <u>et al.</u>,<br>    **Defendants** | :<br>: | |

## MEMORANDUM

Pending before the Court is Defendants' motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. No. 36.) The motion addresses the threshold issue of whether Defendants have met their burden to establish the affirmative defense of Plaintiff Tarahjay M. Ross ("Plaintiff")'s failure to exhaust available administrative remedies in accordance with the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, before commencing suit in this Court. For the reasons set forth below, the Court finds that Defendants have met their burden as to some of Plaintiff's surviving claims. As a result, the Court will grant in part and deny in part their motion for summary judgment.

**I.    BACKGROUND**

Plaintiff, a state prisoner in the custody of the Pennsylvania Department of Corrections, is currently incarcerated at a state correctional institution in Waymart, Pennsylvania. (Doc. No. 48.) He commenced the above-captioned action on November 23, 2021, while he was a pretrial detainee at the Franklin County Jail in Chambersburg, Pennsylvania. (Doc. No. 1 at 2, 17.) More specifically, he filed a pro se complaint pursuant to the provisions of 42 U.S.C. § 1983 ("Section 1983") concerning events that allegedly occurred while he was incarcerated as a pretrial detainee at Dauphin County Prison ("DCP") in Harrisburg, Pennsylvania. (<u>Id.</u> at 7–14.) Named as defendants are the following individuals, all of whom appear to have worked at DCP

during the period of time relevant to Plaintiff's Section 1983 claims: Captain Steve Smith ("Smith"); Lieutenant Greg Mendenhall ("Mendenhall"); Lieutenant Richard Armermann ("Armermann"); Warden Gregory Briggs ("Briggs"); Warden Brian Clark ("Clark"); and Correctional Officers Matthew Danner ("Danner"), Cameron Weaver ("Weaver"), George Bell ("Bell"), John Scott[1] ("Scott"), and First Name Unknown Chaz ("Chaz"). (Id. at 1–6.)

As for the factual allegations in his amended complaint, Plaintiff alleges as follows. From February 20, 2021, until February 21, 2021, he was "kept in [his] cell for 32 hours against [his] will." (Id. at 7.) He told several corrections officers that he had not received his recreation time, and they responded to him that they would check the cameras, but that there would be consequences if he was lying. (Id.) Plaintiff alleges that the corrections officers came back "and stated [Plaintiff] was burnt, [and that he] would have to wait until the next day." (Id.) Plaintiff does not remember the name of all of these corrections officers, but he does remember Defendant Bell. (Id.) Plaintiff further alleges that he asked first shift for the names of the corrections officers on third shift, but that those officers told him they did not know the names of the corrections officers on third shift. (Id.) And when Plaintiff asked first shift to check the logbook, he was told there was no such thing. (Id.)

In addition, Plaintiff alleges that, on February 23, 2021, he was told to lock into his cell after being out for fifty (50) minutes despite recreation being an hour long. (Id. at 8.) He alleges that he got a broom so that he could sweep out his cell for the last ten (10) minutes, but that Defendant Scott followed him, took the broom, and swung it at him, hitting him on the left shoulder. (Id.) Plaintiff alleges that he filed a complaint on an inmate request form. (Id.) The

---

[1] Defendants explain that Plaintiff has misnamed Jake Scott as "John Scott" in the complaint. (Doc. No. 38 at 1.) Plaintiff appears to acknowledge this (Doc. No. 39 at 1), but has not made a formal request to reflect this change on the Court's docket.

following day, Plaintiff had a court appearance and took the yellow carbon copies of his inmate request form to tell his Public Defender about what had been occurring at DCP. (Id.) She told Plaintiff "to keep writing them" and that she was "going to send someone to come talk to [him] about the issues [he] was having with the correctional officers." (Id.)

Plaintiff further alleges that, on February 25, 2021, he was let out of his cell at 6:00 a.m. for recreation. (Id.) Plaintiff alleges that he got a tablet from the charging station and that he also placed two (2) more tablets by the door of cell fourteen (14). (Id. at 8–9.) Plaintiff then pressed the intercom located by the "P-1 Pod" door entrance, and Defendant Scott answered by stating: "what dummy." (Id. at 9.) Plaintiff alleges that he asked for cell fourteen (14) to be opened so that the inmates could grab their tablets, but that Defendant Scott refused and told Plaintiff that he could lock in. (Id.) Plaintiff responded that he could, but that he had not done anything wrong. (Id.) Plaintiff proceeded to log into the tablet that he had and start a video visit with a contact. (Id.) Plaintiff alleges that, sixty (60) seconds later, Defendant Scott entered the Pod, instructing Plaintiff to lock in. (Id.) Plaintiff logged off his visit and started walking towards his cell. (Id.) Plaintiff alleges, however, that Defendant Scott pushed him towards his cell and that, once they arrived at his cell, Defendant Scott told Plaintiff that he was writing him up. (Id.) Plaintiff asked what he was being written up for and Defendant Scott said, "watch this." (Id. at 9–10.)

Plaintiff alleges that, an hour later, Defendants Scott, Weaver, Chaz, and Danner came to his cell with a striped DCP shirt that is used for inmates who are on Restricted Housing Unit status, as well as those who have been written up. (Id. at 10 (acknowledging that he had to "switch clothing" since he had been written up).) Plaintiff alleges that these Defendants directed him to strip and to put on the clothes they had for him. (Id.) Plaintiff asked them to turn on their

3

body cameras for his safety, but they refused. (Id.) Plaintiff stripped down to his boxers, which is where he had placed all of his copies of his request forms. (Id.) Plaintiff alleges that, when he went to retrieve his request forms, Defendants Danner, Weaver, and Chaz grabbed his arm and threw him on the bunk. (Id.) Plaintiff claims that he was handcuffed, punched in the right eye several times, kneed in the thighs, and sprayed with pepper spray. (Id. at 10–11.) Plaintiff also claims that his eye was scratched by someone's finger, that he was bleeding between the eyes, and that Defendant Weaver spit on his back. (Id. at 11.) Plaintiff alleges that these Defendants turned the cameras on as he was screaming that he was not resisting and could not breathe. (Id.)

Plaintiff alleges that he was picked up and was sitting on the side of the bunk when "the lieutenant" entered his cell. (Id.) Plaintiff claims that the lieutenant said, "this is ridiculous," and Plaintiff responded, "tell me about it." (Id.) Plaintiff alleges that he asked the lieutenant to make sure that the copies of his request forms were placed in his "laundry/property bag[,]" but that they were taken instead. (Id.) The lieutenant took pictures of Plaintiff's nose and eye, and a nurse came and gave him Motrin for the pain. (Id.) The next day, a nurse came to Plaintiff's cell, along with Defendant Danner, and asked Plaintiff what had happened. (Id. at 11–12.) Plaintiff explained the incident and alleges that Defendant Danner "made sure to have his camera on during this." (Id. at 12.)

Additionally, Plaintiff alleges that, on March 4, 2021, he was taken to the "Sheriff's underneath the courthouse." (Id.) He met with an individual whom his Public Defender scheduled for him to see. (Id.) This individual took a recorded statement from him and took pictures of his face with an iPhone. (Id.) In addition, Plaintiff alleges that, on March 22, 2021, he was taken out of his cell to talk to Defendant Smith about not receiving recreation and about the inmate request form that he filed concerning his allegation that he had been "abused." (Id.)

On April 1, 2021, he was given a form regarding his meeting with Defendant Smith. (Id. at 12–13.) Plaintiff alleges that not once did Defendant Smith mention "any other" request forms that Plaintiff had filed. (Id.) Defendant Smith told Plaintiff that he had been unable to review camera footage from the alleged incident because of the amount of time that had passed. (Id. at 13.) After an investigation, Defendant Smith ultimately found that Plaintiff's allegations were without merit. (Id.) Plaintiff appealed to Defendant Briggs, who "signed off on it." (Id.)

In addition, Plaintiff alleges that, after he was "brutally abused," he asked Defendant Mendenhall for a phone call to tell his family what happened but that Defendant Mendenhall said "no." (Id.) According to Plaintiff, Defendant Mendenhall was required to allow this phone call, even if Plaintiff had been "texting every incident to loved ones on the tablet through the texting app." (Id. at 13–14.) And, finally, Plaintiff alleges that, on April 22, 2021, he went to court for a bail hearing, during which he told the judge what had happened at DCP. (Id. at 14.) According to Plaintiff, the judge wanted to either give Plaintiff bail or move him to a different jail. (Id.) Plaintiff alleges that, on May 7, 2021, he was transferred from DCP to Franklin County Jail. (Id.)

In connection with all of these allegations, Plaintiff avers that he generally suffers from "anxiety, PTSD, and depression." (Id.) He also avers that he has suffered from the physical injuries noted above, as well as from "mental abuse, migraine headaches, [and] psychological trauma." (Id. at 15.) Based on the foregoing, Plaintiff asserts violations of his Fourth, Eighth, and Fourteenth Amendment rights, as well as violations of 18 U.S.C. §§ 241 and 242. (Id. at 15.) As relief, Plaintiff requests monetary damages, as well as "for [his] abusive Defendants to be terminated from their current job titles." (Id.)

Pursuant to the PLRA, the Court conducted an initial review of Plaintiff's complaint and issued a Memorandum and Order on December 3, 2021, which, inter alia, granted Plaintiff's motion for leave to proceed in forma pauperis and dismissed, in part, his complaint for failure to state a claim upon which relief could be granted pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). (Doc. Nos. 7, 8.) More specifically, the Court dismissed all of Plaintiff's Section 1983 claims except for his Fourteenth Amendment excessive force claims against Defendants Scott, Weaver, Chaz, and Danner. (Id.) The Court also granted Plaintiff leave to file an amended complaint within thirty (30) days. (Id.) The Court cautioned Plaintiff that, if he failed to file an amended complaint within that timeframe, the Court would direct service of his complaint upon Defendants Scott, Weaver, Chaz, and Danner, and this matter would proceed only on his Fourteenth Amendment claims against those Defendants. (Id.)

After Plaintiff failed to file an amended complaint in accordance with the Court's December 3, 2021 Memorandum and Order, the Court dismissed with prejudice all claims that had been previously dismissed without prejudice and directed the Clerk of Court to terminate the following Defendants from this action: Smith; Mendenhall; Armermann; Briggs; Clark; and Bell. (Doc. No. 9.) In addition, the Court directed the Clerk of Court to serve a copy of the complaint upon the remaining Defendants—i.e., Defendants Scott, Weaver, Chaz, and Danner. (Id.)

After waiving service of the complaint (Doc. No. 11), Defendants Scott, Weaver, and Danner ("Defendants") filed a motion to dismiss, along with a brief in support thereof.[2] (Doc.

---

[2] There is no indication on the Court's docket that service was effectuated upon Defendant Chaz. As previously explained by the Court, however, if service is unable to be effectuated upon any of the Defendants due to Plaintiff's failure to properly name a Defendant or to provide an accurate mailing address for the Defendants, then Plaintiff would be required to correct this deficiency. (Doc. No. 9 at 2 ¶ 4 (explaining that failure to comply with that directive may result in dismissal of Plaintiff's claims against such a defendant).)

Nos. 15, 16.)  In their motion and briefing, Defendants raised the following arguments: (1) Plaintiff has not exhausted his available administrative remedies at DCP; (2) Defendant Weaver was not present for the alleged incident on February 25, 2021—i.e., the only incident in which Plaintiff alleges his involvement; (3) Plaintiff's allegations of excessive force have no merit; and (4) Defendants are entitled to qualified immunity.  (Doc. Nos. 15, 16, 20.)  On June 24, 2022, Plaintiff filed a brief in opposition to the motion to dismiss (Doc. No. 19), and Defendants subsequently filed a reply to Plaintiff's brief in opposition (Doc. No. 20).

On December 12, 2022, the Court resolved Defendants' motion to dismiss and addressed their initial argument that Plaintiff failed to exhaust available administrative remedies before commencing suit in federal court.  (Doc. No. 29.)   More specifically, the Court determined that, while there was a dispute between the parties as to whether Plaintiff exhausted his available administrative remedies, that dispute was not properly before the Court, as it had neither been fully presented nor comprehensively argued by Defendants.  (Id. at 11.)  In particular, Defendants had not alleged or shown the history of any grievances that Plaintiff may have filed at DCP concerning his remaining Fourteenth Amendment excessive force claims, nor submitted any copies of such grievances to the Court.  (Id.)  Additionally, Defendants relied on documentary evidence that was extraneous to Plaintiff's complaint.  (Id. at 11–12.)  Finally, the Court also remarked that, before it is permitted to rule on factual disputes relevant to the issue of administrative exhaustion, it is required to place the parties on notice that it will consider the same in its role as a fact-finder.  (Id.)  As a result, the Court found several grounds upon which to deny Defendants' motion to dismiss as it pertained to Plaintiff's purported failure to exhaust available administrative remedies.  (Id. at 12.)

However, because exhaustion of available administrative remedies is a prerequisite for Plaintiff's assertion of his Fourteenth Amendment excessive force claims against Defendants in this Section 1983 action, and because Defendants were asserting the affirmative defense that Plaintiff failed to exhaust administrative remedies, the Court denied without prejudice Defendants' motion to dismiss. (Id. at 13.) In addition, the Court directed Defendants to file a motion for summary judgment in order to properly address the threshold issue of whether they have met their burden to establish their affirmative defense. (Id.)

In accordance with that decision, Defendants filed a motion for summary judgment, supporting brief, and statement of material facts. (Doc. Nos. 36 through 38.) Plaintiff has opposed that motion by filing several responses and exhibits. (Doc. Nos. 39 through 42.) Defendants have since filed a reply brief to Plaintiff's filings (Doc. No. 43.) Thus, Defendants' motion for summary judgment, which has been fully briefed by the parties, is ripe for the Court's resolution.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires the Court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). A dispute of material fact is "genuine" if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine dispute of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party.  See Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence that demonstrates the absence of a genuine dispute of material fact, the nonmoving party is required to go beyond his pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine dispute.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case that it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex, 477 U.S. at 323; see also Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

As noted supra, when determining whether a dispute of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party.  See White, 862 F.2d at 59.  In doing so, the Court must accept the nonmovant's allegations as true and resolve

any conflicts in his favor.  See id. (citations omitted).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted."  See L.R. 56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a pro se litigant.  These rules apply with equal force to all parties.  See Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013) (noting that pro se parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

**III.    DISCUSSION**

As set forth above, Defendants have filed a motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the basis that Plaintiff failed to exhaust available administrative remedies before commencing this suit in federal court.  (Doc. No. 36.) The PLRA's exhaustion requirement mandates that "[n]o action shall be brought with respect to prison conditions under [S]ection 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  See 42 U.S.C. § 1997e(a) (emphasis added).  In other words, exhaustion of available administrative remedies is a prerequisite for a prisoner asserting a claim under Section 1983 regarding his prison conditions.  See Ross v. Blake, 578 U.S. 632, 638 (2016) (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies" (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006)); Jones v. Bock,

549 U.S. 199, 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court" (citation omitted) (alteration added)); Booth v. Churner, 532 U.S. 731, 733–34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions" (quoting 42 U.S.C. § 1997e(a))).

"The PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules.'" Downey v. Pennsylvania Dep't of Corr., 968 F.3d 299, 305 (3d Cir. 2020) (quoting Woodford, 548 U.S. at 88). And the applicable "procedural rules are supplied by the individual prisons." See id. (citations omitted); Spruill v. Gillis, 372 F.3d 218, 222 (3d Cir. 2004) (stating that "the determination [of] whether a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances . . ."); see also Jones, 549 U.S. at 218 (explaining that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim . . ."); Woodford, 548 U.S. at 90 (stating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules . . .").

A prisoner's failure to follow these procedural rules will result in a procedural default of his claims. See id. at 230–32 (concluding that the PLRA's exhaustion requirement includes a procedural default component); Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010) (recognizing this holding in Spruill). A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to him. See Rinaldi v. United States, 904 F.3d 257, 266 (3d Cir. 2018) (stating that "[t]he PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available'" (quoting

11

Woodford, 548 U.S. at 93)). "An administrative remedy is unavailable when it 'operates as a simple dead end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" Downey, 968 F.3d at 305 (quoting Shifflett v. Korszniak, 934 F.3d 356, 365 (3d Cir. 2019)).

The failure to exhaust available administrative remedies is an affirmative defense. See Jones, 549 U.S. at 216. Accordingly, "[t]he burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant." See Rinaldi, 904 F.3d at 268 (citing Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002)). However, "once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him." See id. (citation omitted).

Finally, requiring a prisoner to exhaust available administrative remedies before filing suit in federal court advances the policy justifications of the PLRA—to "return[ ] control of the inmate grievance process to prison administrators, encourage[ ] the development of an administrative record, and perhaps settlements, within the inmate grievance process, and reduc[e] the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits." See Downey, 968 F.3d at 305 (citation and internal quotation marks omitted) (alterations added)); Jones, 549 U.S. at 204 (explaining that the exhaustion requirement "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court").

Here, pursuant to the DCP's Grievance Guidelines, an inmate may file a grievance concerning "the behavior or action toward an inmate by a staff member or another inmate, or any matter of concern, including conditions of confinement." (Doc. No. 37-3 at 1.) "An inmate must

write out the complete grievance, being as brief but specific as possible, soon after the alleged occurrence." (Id.)  There is, however, "no specific form to be used for writing a grievance; it may be written on 8 ½ by 11' paper or any inmate request slip."[3]  (Id. (emphasis added).)

In addition, DCP's Grievance Guidelines set forth four (4) levels of review: (1) submission of a grievance to the Warden, Deputy Warden, or Security Major for initial review and recommendation by a designee, which is then forwarded to the Warden for decision; (2) an appeal of the Warden's decision to the Chairman of the Dauphin County Prison Board of Inspectors ("Prison Board") for review and decision; (3) an appeal of the Chairman's decision to the "full" Prison Board; and (4) an appeal from the Prison Board's decision to the Dauphin County Solicitor.  (Id.)  "The Solicitor's decision shall be final."  (Id.)

As reflected by Plaintiff's complaint, as well as the parties' statement of material facts,[4] there are three (3) incidents relevant to Plaintiff's surviving Section 1983 claims against Defendants (i.e., Weaver, Danner, and Scott): (1) the February 23, 2021 incident wherein Defendant Scott allegedly followed Plaintiff to his cell and hit him with a broom (Doc. Nos. 37

---

[3]  Defendants initially contend that the "inmate request form" procedure is different from the inmate "grievance" procedure at DCP.  (Doc. No. 38 at 5–6.)  In connection with this distinction, Defendants argue that Plaintiff only filed inmate request forms, not grievances, and, thus, did not exhaust the internal grievance process at DCP.  (Id.)  Defendants also appear to concede, however, that an inmate request form can initiate the grievance process at DCP.  (Id. at 6.)  Moreover, the plain language of DCP's Grievance Guidelines, as set forth above, specifically provides that "[t]here is no specific form to be used for writing a grievance[,]" and that it may be written on an "inmate request slip."  (Doc. No. 37-3.)  Thus, although the parties devote some of their briefing to this issue, the Court notes that Defendants' argument is unavailing.

[4]  In accordance with the Court's Local Rules, Defendants have filed a statement of material facts in support of their motion for summary judgment (Doc. No. 37), and Plaintiff has filed a response to Defendants' statement of material facts (Doc. No. 40).  Accordingly, the material facts in this Memorandum are derived from the parties' statement of material facts.  To the extent that there are any disputed issues of material fact, the Court expressly notes such disputes herein.

¶¶ 3–6; 40 ¶¶ 3–4); (2) the first incident on February 25, 2021, wherein Defendant Scott allegedly pushed Plaintiff towards his cell (Doc. Nos. 37 ¶¶ 7–10; 40 ¶¶ 7–8); and (3) the second incident on February 25, 2021 wherein Plaintiff was, inter alia, thrown onto a bunk, handcuffed, punched in the right eye several times, scratched between his eyes, kneed in his thigh, and sprayed with pepper spray (Doc. Nos. 37 ¶¶ 11–16; 40 ¶¶ 11–15).

Defendants assert that Plaintiff has not fully completed the various levels of review set forth in DCP's Grievance Guidelines as to any of these incidents. (Doc. Nos. 36 through 38.) In support, Defendants have submitted the affidavit of former-defendant Briggs, the Warden of DCP. (Doc. No. 37-2 at 1.) Briggs states that, as part of his employment, he is "familiar with the records of former Inmate [Plaintiff]." (Id.) Briggs further states that, while Plaintiff was housed at DCP, "[n]o appeals were made on any of his grievances and, therefore, [Plaintiff] failed to follow the established grievances guidelines[.]" (Id. at 2.) Thus, Defendants contend that, even if Plaintiff initiated the grievance process at DCP with respect to any of the incidents set forth above, Plaintiff did not properly complete that process, and, as a result, failed to properly exhaust his available administrative remedies. (Doc. No. 38 at 6–8.)

In response, Plaintiff argues that he pursued his administrative remedies by filing inmate request forms while he was incarcerated at DCP. (Doc. No. 40 at 3.) In support, Plaintiff has submitted various documentation, including an inmate request from. (Doc. Nos. 41.) Consistent with Defendants' arguments, however Plaintiff has not submitted any documentation which would suggest that he pursued any of the remaining levels of appeal, as set forth in DCP's Grievance Guidelines. See (id.). Plaintiff, appearing to acknowledge his failure to do so, argues that he was transferred from DCP to Franklin County Jail on May 1, 2021, and that, as a result of

his transfer and Defendants' alleged failure to send him responses to his inmate request forms, his administrative remedies were rendered unavailable. (Doc. No. 40 at 3.)

The Court, having reviewed the parties' respective arguments, the underlying record in this matter, and relevant authorities, will grant in part and deny in part Defendants' motion for summary judgment on the issue of administrative exhaustion. In order to create a clear and comprehensive record in this matter, the Court will address Plaintiff's exhaustion efforts as it relates to his remaining Fourteenth Amendment excessive force claims.

### A. The First February 25, 2021 Incident

As for the first incident on February 25, 2021 (i.e., the incident wherein Defendant Scott allegedly pushed Plaintiff towards his cell), the record reveals that Plaintiff did not pursue any administrative remedies at DCP or subsequently appeal any adverse decision through the various levels of appeal in DCP's Grievance Guidelines prior to filing suit in this Court. Although Plaintiff generally argues that he pursued his administrative remedies and has submitted documentary evidence in support of this argument (Doc. No. 41), none of that evidence suggests that he exhausted his remedies with respect to his allegations that Defendant Scott allegedly pushed him on February 25, 2021.

Accordingly, the Court concludes that Defendants have met their initial summary judgment burden to demonstrate that there is no genuine dispute of material fact that Plaintiff failed to exhaust his administrative remedies with respect to this claim. Under Rule 56 of the Federal Rules of Civil Procedure, the burden shifted to Plaintiff to respond by pointing to specific facts, supported by evidence in the record, to show a genuine dispute of material fact. Plaintiff, however, has not done so. See, e.g., Martin v. Godwin, 499 F.3d 290, 295 (3d Cir.

2007); see also Fed. R. Civ. P. 56(c).  Thus, the Court will grant Defendants' motion for summary judgment on this claim.

### B. The February 23, 2021 Incident

With respect to the February 23, 2021 Incident (i.e., the incident wherein Plaintiff alleges that Defendant Scott hit him with a broom), Defendants acknowledge that Plaintiff initiated the administrative remedy process at DCP by submitting an inmate request form.  (Doc. Nos. 43 at 3; 37-4.)  Defendants also acknowledge that Briggs "signed-off" on Lieutenant Bradley Osenga's recommendation that Plaintiff's allegations concerning this incident were "without merit."  (Id.)  Defendants contend, however, that Plaintiff did not subsequently complete all other levels of review as set forth in DCP's Grievance Guidelines.  (Doc. No. 43 at 3–6.)  And, in support, they have submitted Briggs' affidavit wherein he confirms the same.  (Doc. No. 37-2 at 2.)  As a result, Defendants contend that Plaintiff failed to exhaust available administrative remedies with respect to this claim.  (Doc. No. 43 at 3–6.)

Plaintiff appears to assert, however, that those administrative remedies were unavailable to him for two (2) separate reasons.  The first reason is that Lieutenant Bradley Osenga's initial review and recommendation for Briggs was not completed until May 28, 2021, a date after which Plaintiff had already been transferred from DCP to Franklin County Jail.  (Doc. Nos. 40 at 1, 3 (asserting that he was transferred to Franklin County Jail on May 7, 2021); 41 at 3 (establishing that the initial response to Plaintiff's grievance was not issued until, approximately, May 28, 2021).)  The second reason is that the decision was sent to "508 S 13th St Harrisburg, PA 17104[,]" as reflected by a notation made on the decision (Doc. Nos. 37-4; 41 at 3), and not to Franklin County Jail where Plaintiff was incarcerated. (Doc. No. 40 at 1.)  Thus, as a result of

his transfer and the fact that he did not receive Briggs' decision, Plaintiff contends that the Grievance Guidelines were rendered unavailable to him.  See (id.).

The Court observes that, after Plaintiff was transferred from DCP to Franklin County Jail, he was still proceeding in this action on a Section 1983 complaint, asserting claims related to his prison conditions and, thus, he was still under a duty to exhaust available administrative remedies, as required by the PLRA.  See 42 U.S.C. § 1997e(a) (containing the PLRA's exhaustion requirement, which mandates that "[n]o action shall be brought with respect to prison conditions under [S]ection 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted").  In other words, Plaintiff's transfer alone does not excuse his duty to exhaust.

However, the Court observes that Briggs' response to Plaintiff's grievance was sent to DCP after Plaintiff had already been released from that prison.  The Court also observes that there is no evidence in the record suggesting that DCP officials forwarded Plaintiff's mail to Franklin County Jail where he was incarcerated.  Thus, while the Court would ordinarily be inclined to agree with Defendants that Plaintiff was required to continue to appeal the various levels of review in DCP's Grievance Guidelines, the evidence of record indicates that Plaintiff did not receive Briggs' decision and, thus, had no decision to appeal.

While Defendants suggest that Plaintiff should have, nevertheless, taken affirmative steps to "follow up" on his grievance prior to filing this lawsuit (Doc. No. 43 at 3), such as filing a Right to Know Law request (id. at 5), the Court finds that suggestion unavailing.  Not only does DCP's Grievance Guidelines contain no such requirement, but the United States Court of Appeals for the Third Circuit has emphasized that, "just as prisoners [must] comply with the procedural demands of a system created by their jailors[,] [n]o less must prisons comply with the

demands of the system they created[.]" See Hardy v. Shaikh, 959 F.3d 578, 586–87 (3d Cir. 2020) (alterations in original) (citation and internal quotation marks omitted). And, here, the DCP's Grievance Guidelines state that "the inmate shall receive a copy of [the Warden's] decision." (Doc. No. 37-3.) Thus, once DCP officials rendered a decision on the grievance, the onus fell on DCP officials to ensure that the decision was at least sent to the institution at which Plaintiff was incarcerated.

Accordingly, the Court concludes that, while Defendants have met their initial summary judgment burden to demonstrate that there is no genuine dispute of material fact that Plaintiff did not pursue any of his appeals as set forth in DCP's Grievance Guidelines with respect to the February 23, 2021 incident (i.e., the incident when Defendant Scott hit him with a broom), Plaintiff has met his burden by creating a genuine dispute of material fact as to the availability of those remedies. Thus, the Court will deny Defendants' motion for summary judgment with respect to this claim.

### C. The Second February 25, 2021 Incident

With respect to the second February 25, 2021 incident (i.e., the incident wherein Plaintiff alleges that Defendants were involved with, inter alia, handcuffing him, punching him, and spraying him with pepper spray), Defendants appear to acknowledge that Plaintiff initiated the administrative remedy process at DCP by submitting an inmate request form concerning this incident. (Doc. Nos. 43 at 6; 41 at 5.) Defendants argue, however, that Plaintiff did not subsequently complete all other levels of review as set forth in DCP's Grievance Guidelines. (Doc. No. 43 at 6–8.) And, in support, they have submitted Briggs' affidavit wherein he confirms the same. (Doc. No. 37-2 at 2.)

In response, Plaintiff appears to acknowledge that he did not pursue those various levels of review. Plaintiff contends, however, that those levels of review were rendered unavailable to him because DCP officials never issued a decision with respect to this grievance. (Doc. No. 40 at 3.) The Court, having carefully reviewed the evidence of record, is persuaded by Plaintiff's argument. While the record contains a copy of Plaintiff's inmate request form concerning this February 25, 2021 incident (Doc. No. 41 at 5), the record is bereft of any decision that was issued in response to that grievance.

Indeed, Defendants, who appear to acknowledge that Plaintiff filed this grievance, have not submitted any evidence into the record which would suggest that the Warden issued a decision in response to this grievance. Similarly, Defendants have not submitted any evidence into the record which would suggest (a) when such a decision would have been made or issued to Plaintiff and (b) where the decision would have been sent for Plaintiff's receipt. Thus, as stated above, Plaintiff cannot be expected to appeal a decision he never received. Again, the onus was on DCP officials to issue a decision on Plaintiff's grievance and to send him a copy of that decision, for without which he was unable to properly exhaust his administrative remedies in accordance with DCP's Grievance Guidelines.

Accordingly, the Court concludes that, while Defendants have met their initial summary judgment burden to demonstrate that there is no genuine issue of material fact that Plaintiff did not pursue any of his appeals with respect to the second February 25, 2021 incident (i.e., the incident wherein Plaintiff alleges that Defendants were involved with, inter alia, handcuffing him, punching him, and spraying him with pepper spray), Plaintiff has met his burden by creating a genuine dispute of material fact as to the availability of those remedies. Thus, the Court will deny Defendants' motion for summary judgment with respect to this claim.

## IV. CONCLUSION

Accordingly, for all of the reasons set forth above, the Court will grant in part and deny in part Defendants' motion for summary judgment. (Doc. No. 36.) In addition, the Court will set deadlines by which the parties shall complete discovery and file dispositive motions. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania